UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-1169

TRACY SCOTT,

Plaintiff - Appellant,

v.

LUMBEE RIVER ELECTRIC MEMBERSHIP CORPORATION,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. James C. Fox, Senior District Judge. (5:06-cv-00092-F)

Argued: May 13, 2008                    Decided: June 10, 2008

Before KING, Circuit Judge, HAMILTON, Senior Circuit Judge, and Henry F. FLOYD, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Barry Nakell, Chapel Hill, North Carolina, for Appellant. Aaron M. Christensen, SMITH & CHRISTENSEN, LLP, Charlotte, North Carolina, for Appellee. **ON BRIEF:** W. Britton Smith, Jr., SMITH & CHRISTENSEN, LLP, Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Tracy Scott brought federal causes of action against Lumbee River Electric Membership Corporation (the Cooperative) alleging (1) sex discrimination in the Cooperative's failure to hire her for an Apprentice Power Line Technician position and (2) retaliation after she filed a charge of discrimination with the Equal Opportunity Commission, both in violation of 42 U.S.C. §§ 2000d and 2000e-2(a). Scott also asserted a state breach of contract claim.

The Cooperative subsequently moved for summary judgment, which the district court granted by order filed January 31, 2007. This appeal followed.

## I.

"We review the district court's order granting summary judgment de novo, viewing the facts in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Garofolo v. Donald B. Heslep Assocs., Inc. 405 F.3d 194, 198 (4th Cir. 2005). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The primary issue is whether the material facts present a sufficient disagreement as to require a trial, or whether the facts are

2

sufficiently one-sided that one party should prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). The substantive law of the case identifies which facts are material. Id. at 248. Only disputed facts potentially affecting the outcome of the suit under the substantive law preclude the entry of summary judgment. Id.

II.

The relevant facts, as set forth in the district court's order, are as follows:

**A. The Parties**
The Cooperative is a nonprofit rural electric membership cooperative that provides electric utility services to approximately 48,806 premises throughout sections of Hoke, Cumberland, Robeson and Scotland counties. The Cooperative is headquartered in Red Springs, North Carolina, and maintains branch offices in the municipalities of Lumberton, Fayetteville, Fairmont, Laurinburg and Radford. The Cooperative employs approximately 108 people and maintains more than 5,056 miles of electric distribution lines.

[Scott], at the age of 23, began working at the Cooperative in June 2001 as a distribution systems operator. Prior to working at the Cooperative, [Scott] had received her high school diploma in 1995, as well as an Associate in Applied Science Degree in the Electric/Electronics Program from Robeson Community College in May 2001. The distribution systems operator position is an "inside" position, as opposed to an "outside" position where an employee works in the field. Distribution systems operators work within the Cooperative's Distribution Center, which provides around-the-clock outage response

3

services.  The operators receive calls from the Cooperative's members concerning outages, and communicate with the outside employees in the field to facilitate outage repairs. Necessarily, the operators must be able to work with the Cooperative's electronic map of the system.  By all accounts, [Scott] was a satisfactory employee.

## B. Apprentice Power Line Technician Position

On April 5, 2004, the Cooperative posted internally three "Apprentice Power Line Technician" vacancies, the entry-level position in the Cooperative's four-year lineman apprenticeship program.  The program includes coursework at Nash Community College in the Electric Lineman Technology Program and on-the-job training. The "Position Specifications" of the position were listed as follows:

| | |
|---|---|
| **Education:** | High school diploma or equivalent required. Should be able to successfully complete appropriate technical schools in order to perform job activities. |
| **Experience:** | None required for entry level position. |
| **\*Job Knowledge:** | Knowledge of overhead and underground construction and maintenance of distribution lines.  Should have knowledge of updated First Aid and CPR. |
| **Abilities & Skills:** | Should be able to perform activities as required in the construction and maintenance of distribution lines.  Ability to operate line equipment. Legible handwriting is required. Must have a valid North Carolina Driver's License and be able to obtain a |

4

Commercial Driver's License. Must be physically able to perform the duties of this position, such as climbing and some heavy lifting.

**Working Conditions**: Subject to outside work in all kinds of weather. Subject to being on call during emergencies. Subject to having to work in long rubber sleeves in direct contact with energized lines.

## C. [Scott's] Interest in the Position

[Scott] set for herself the goal of becoming a Power Line Technician. Even before the vacancies in the apprentice program were posted, [Scott] expressed her interest in the position to various Cooperative employees and officials. Specifically, four months before the position was posted, [Scott] spoke to Steve Davis, the Operations Manager for the Cooperative, about the schooling provided by the apprentice program. According to [Scott], Davis told [Scott] that before she applied for the program, he would have to see whether she could climb poles. [Scott] contends that Davis later told her that he could not take her out to assess her climbing ability because David Altman, Senior Vice-President of Engineering, Economic and Business Development at the Cooperative, told Davis that no one else had to have a preliminary assessment.

[Scott] also told Ronnie Hunt, the President and C.E.O. of the Cooperative, that she was considering applying for the position. Hunt related his past experience as a Power Line Technician to [Scott]. Hunt has testified that he thought [Scott] was "halfway joking" about applying for the job, because she already was in a higher-paying position, and would have to take a reduction in pay to go through the apprentice program. [Scott] also spoke with Roger Bullard, a Foreman of

5

Underground Maintenance, about the requirements of the Power Line Technician position, and accompanied his crew out in the field on one occasion.

Finally, [Scott], after applying for the position, told Carmen Dietrich, Senior Vice President of Corporate Services, that she had applied for the apprentice program. [Scott] also asked Dietrich if she would be on the interview committee, and how Dietrich felt about having a female working on a line crew. Dietrich informed [Scott] that she would not be on the committee, and that she didn't think the Power Line Technician position was a woman's job.

**D. The Selection Process**

Hunt, as the CEO and President of the Cooperative, is the only Cooperative official with hiring, firing, and promotion authority. The Cooperative, however, uses a committee to help screen and recommend candidates prior to Hunt's final selections. The Cooperative contends that this process is designed to insulate the decisionmaking process from any improper influences or favoritism toward any particular candidate. As part of its role in the selection process, the committee is required to submit a unanimous recommendation to Hunt. If the committee fails to do so, Hunt then becomes personally involved in the interview process. Regardless, Hunt is entitled to request additional information at any time during the process.

The Cooperative contends that the committee follows several procedures to insure nondiscriminatory treatment and equal opportunities for all candidates. Specifically, the Vice President for Human Resources, Jackie Harding, reviews and approves interview questions before including them on the printed questionnaire form. During the actual interviews, the exact same questions are read to each of the candidates, in the exact same order, by the exact same committee member. The committee members

6

generally refrain from asking follow-up questions of any of the candidates, in an effort to avoid any inference of favoritism. Rather, it is up to each candidate to convince the committee that he or she is one of the best-qualified candidates for the vacancy.

The interview committee for the Apprentice Line Technician Position consisted of the following Cooperative officials: (1) Harding, Vice President for Human Resources; (2) Dietrich, Senior Vice President of Corporate Services; (3) Davis, Operations Manager, and (4) Tracy Bensley, Senior Vice President of Engineering and Operations. Three positions in the Apprentice program were open, and the committee was charged with interviewing the six applicants and recommending a total of three applicants for the open positions. Out of the six applicants, [Scott] was the only female.

[Scott] indicates that at the outset of her interview, Dietrich apologized to [Scott] for telling her that she would not be serving on the interview committee. Contemporaneous interview notes indicate that the applicants were each asked ten questions. The second question asked of each applicant was "What would you bring to this position that would benefit Lumbee River?" [Scott] has testified that she answered the question by pointing out that she would bring diversity and change to the position because the Cooperative had never before employed a woman as a Power Line Technician. She also indicated to the interviewers that if a woman was hired for the position, it would help bolster the Cooperative's reputation in the community. The interview reports indicate that at least three of the four [committee members] found [Scott's] response to the second question to be inappropriate.

At some point after [Scott] applied for the position, Bensley approached David Hunt, a Transmission Substation Foreman, and asked how he would feel about training a female for a

7

Power Line Technician position. According to David Hunt, he responded that he would have no problem training a female for the position, and the conversation ended.

After interviewing all the applicants, the interview committee unanimously recommended that Derek Owens, David Humphrey, and James Locklear be selected for the Apprentice Line Technician positions. Relying on the committee's recommendation, as well as his own personal knowledge of the six applicants, Hunt selected Owens, Humphrey, and Locklear for the positions.

Once she was notified of her non-selection, [Scott] resigned from the Cooperative in order to attend school in a general course of study.

(J.A. 38-42) (citations omitted).

III.

In awarding summary judgment to the Cooperative on Scott's mixed-motive theory, the district court held that Scott had failed to satisfy the mandate of Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277 (4th Cir. 2004), "to come forward with sufficient evidence from which a jury could conclude that the interview committee was principally responsible, or the actual decisionmaker, for the decision not to select her for the Apprentice Power Line Technician position." (J.A. 47.) Therefore, "[Scott] cannot rely on the alleged actions and comments of the interview committee members in establishing her mixed-motive case." (J.A. 49.) The district court also rejected Scott's contention that Hunt's actions and comments amounted to ample evidence on a

8

mixed-motive theory.

The district court then carefully analyzed Scott's claim pursuant to the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under McDonnell Douglas, the plaintiff must first establish a prima facie case of sex discrimination, by demonstrating that "(1) she is a member of a protected class; (2) her employer had an open position for which she applied; (3) she was qualified for the position; (4) she was rejected for the position under circumstance giving rise to an inference of unlawful discrimination." Mackey v. Shalala, 360 F.3d 463, 468 (4th Cir. 2004)(citation omitted).

After determining that Scott had indeed established a prima facie case of discrimination, the burden shifted "to the Cooperative to state a legitimate, non-discriminatory reason for failing to hire [Scott] for the Apprentice Power Line Technician position." (J.A. 51). The reasons set forth by the Cooperative that the other applicants were chosen for the Apprentice Power Line Technician positions were:

> (1) each had "outside" experience and knew their way physically around the system and could effectively navigate more than 5,065 miles of system lines; (2) each could already physically locate substations, feeders, bays, lines, and breakers on the system; (3) each had experience in connecting and disconnecting consumers, installing breakers, spotting trouble on the system, helping Power Line Technicians raise lines and observing other procedures, and (4) one of the applicants already was certified to climb and possessed a commercial's driver's license.

9

(J.A. 51.)

The district court then noted that the burden shifted back to Scott to demonstrate that the Cooperative's proffered reasons for failing to hire her for the Apprentice Power Line Technician position were merely a pretext for sex discrimination. After considering Scott's arguments on this issue, the district court held that Scott had failed to proffer evidence of pretext.

Having reviewed the record and the applicable law pursuant to the standard set forth above, and having had the benefit of oral argument, we conclude that the district court did not err in granting summary judgment in favor of the Cooperative. Accordingly, we affirm based on the reasoning of the district court. Tracy Scott v. Lumbee River Elec. Memb'p Corp., No. 5:06-CV-92-F(2) (E.D.N.C. Jan. 31, 2007).

                                                        AFFIRMED